```
                                    ┌─────────────────────────────────┐
                                    │ ✓___ FILED      ___ RECEIVED     │
                                    │ ___ ENTERED     ___ SERVED ON    │
                                    │      COUNSEL/PARTIES OF RECORD   │
                                    │  ┌───────────────────────────┐  │
                                    │  │                           │  │
                                    │  │      MAY 2 8 2024          │  │
                                    │  │                           │  │
                                    │  └───────────────────────────┘  │
                                    │     CLERK US DISTRICT COURT      │
                                    │      DISTRICT OF NEVADA          │
                                    │ BY:_____ DEPUTY       │
                                    └─────────────────────────────────┘
```

1  E. MARTIN ESTRADA
   United States Attorney
2  MACK E. JENKINS
   Assistant United States Attorney
3  Chief, Criminal Division
   RANEE A. KATZENSTEIN
4  Assistant United States Attorney
   Chief, Major Frauds Section
5  JAMES C. HUGHES (Cal. Bar No. 263878)
   Assistant United States Attorney
6  Major Frauds Section
        1100 United States Courthouse
7       312 North Spring Street
        Los Angeles, California 90012
8       Telephone:  (213) 894-2579
        Facsimile:  (213) 894-6269
9       E-mail:     James.Hughes2@usdoj.gov

10 GLENN S. LEON
   Chief, Fraud Section
11 Criminal Division, U.S. Department of Justice
   THEODORE M. KNELLER (D.C. Bar No. 978680)
12 Trial Attorney, Fraud Section
   Criminal Division, U.S. Department of Justice
13      1400 New York Avenue, NW
        Washington, DC 20005
14      Telephone:  (202) 514-5799
        E-mail:     Theodore.Kneller@usdoj.gov
15
   Attorneys for Plaintiff
16 UNITED STATES OF AMERICA

17              UNITED STATES DISTRICT COURT

18          FOR THE CENTRAL DISTRICT OF CALIFORNIA
```

| 19 UNITED STATES OF AMERICA, | CR No. 2:23-cr-00313-SB |
|---|---|
| 20              Plaintiff, | PLEA AGREEMENT FOR DEFENDANT DAVID LEE KAGEL |
| 21              v. | |
| 22 DAVID LEE KAGEL, | |
| 23              Defendant. | |

24

25      1.   This constitutes the plea agreement between defendant DAVID

26 LEE KAGEL ("defendant") and the United States Attorney's Office for

27 the Central District of California and the United States Department

28 of Justice, Criminal Division, Fraud Section (collectively referred

to herein as the "United States"), in the above-captioned case.  This
agreement is limited to the United States and cannot bind any other
federal, state, local, or foreign prosecuting, enforcement,
administrative, or regulatory authorities.

<u>DEFENDANT'S OBLIGATIONS</u>

2.   Defendant agrees to:

a.   Give up the right to indictment by a grand jury and,
at the earliest opportunity requested by the United States and
provided by the Court, appear and plead guilty to Count One of the
Information in the form attached hereto as Exhibit A or a
substantially similar form, charging defendant with Conspiracy, in
violation of Title 18, United States Code, Section 371 (Count One).

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained
in this agreement.

d.   Appear for all court appearances, surrender as ordered
for service of sentence, obey all conditions of any bond, and obey
any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be
excluded for sentencing purposes under United States Sentencing
Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not
within the scope of this agreement.

f.   Be truthful at all times with the United States
Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessment at or before the
time of sentencing unless defendant has demonstrated a lack of
ability to pay such assessments.

h.   Defendant agrees that any and all criminal debt

2

ordered by the Court will be due in full and immediately.  The government is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

        i.    Complete the Financial Disclosure Statement on a form provided by the United States and, within 30 days of defendant's entry of a guilty plea, deliver the signed and dated statement, along with all of the documents requested therein, to the United States by either email at usacac.FinLit@usdoj.gov (preferred) or mail to the United States Financial Litigation Section at 300 North Los Angeles Street, Suite 7516, Los Angeles, CA 90012.  Defendant agrees that defendant's ability to pay criminal debt shall be assessed based on the completed Financial Disclosure Statement and all required supporting documents, as well as other relevant information relating to ability to pay.

        j.    Authorize the United States to obtain a credit report upon returning a signed copy of this plea agreement.

        k.    Consent to the United States inspecting and copying all of defendant's financial documents and financial information held by the United States Probation and Pretrial Services Office.

<div align="center">THE UNITED STATES' OBLIGATIONS</div>

3.    The United States agrees to:

        a.    Not contest facts agreed to in this agreement.

        b.    Abide by all agreements regarding sentencing contained in this agreement.

        c.    At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to

<div align="center">3</div>

1  and including the time of sentencing, recommend a two-level reduction

2  in the applicable Sentencing Guidelines offense level, pursuant to

3  U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an

4  additional one-level reduction if available under that section.

5        d.    Except for criminal tax violations (including

6  conspiracy to commit such violations chargeable under 18 U.S.C.

7  § 371), not further criminally prosecute defendant for violations

8  arising out of defendant's conduct described in the agreed-to factual

9  basis of the agreement.  Defendant understands that the United States

10  is free to criminally prosecute defendant for any other unlawful past

11  conduct or any unlawful conduct that occurs after the date of this

12  agreement.  Defendant agrees that at the time of sentencing, the

13  Court may consider the uncharged conduct in determining the

14  applicable Sentencing Guidelines range, the proprietary and extend of

15  any departure from that range, and the sentence to be imposed after

16  consideration of the Sentencing Guidelines and all other relevant

17  factors under 18 U.S.C. § 3553(a).

18  <u>NATURE OF THE OFFENSE</u>

19      4.    Defendant understands that for defendant to be guilty of

20  the crime charged in Count One, that is Conspiracy, in violation of

21  Title 18, United States Code, Section 371, the following must be

22  true:

23        a.    Beginning in or before December 2017, and continuing

24  until in or about June 2022, there was an agreement between two or

25  more persons to violate Title 7, United States Code, Sections 9(1)

26  and 13(a)(5) and Title 17, Code of Federal Regulations, Section

27  180.1(a) by knowingly and willfully, and in connection with a

28  contract of sale of a commodity in interstate commerce, using a

1    device or scheme to defraud, making an untrue statement of material
2    fact, or failing to disclose a material fact that resulted in making
3    statements misleading.
4              b.   In or about December 2017, defendant became a member
5    of the conspiracy knowing of its object and intending to help
6    accomplish it; and
7              c.   One of the members of the conspiracy performed at
8    least one overt act in furtherance of the conspiracy in the Central
9    District of California.

10                        PENALTIES AND RESTITUTION

11        5.   Defendant understands that the statutory maximum sentence
12   that the Court can impose for a violation of Title 18, United States
13   Code, Section 371 is: five years' imprisonment; a three-year period
14   of supervised release; a fine of $250,000 or twice the gross gain or
15   gross loss resulting from the offense, whichever is greatest; and a
16   mandatory special assessment of $100.

17        6.   Defendant understands that defendant will be required to
18   pay full restitution to the victims of the offense to which defendant
19   is pleading guilty.  Defendant agrees that, in return for the United
20   States' compliance with its obligations under this agreement, the
21   Court may order restitution to persons other than the victims of the
22   offense to which defendant is pleading guilty and in amounts greater
23   than those alleged in the count to which defendant is pleading
24   guilty.  In particular, defendant agrees that the Court may order
25   restitution to any victim of any of the following for any losses
26   suffered by that victim as a result: (a) any relevant conduct, as
27   defined in U.S.S.G. § 1B1.3, in connection with the offense to which
28   defendant is pleading guilty.  The parties currently believe that the

applicable amount of restitution is approximately $13,561,923 but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

7.     Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

8.     Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case, suspension of social security benefits during the period of incarceration, and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

9.     Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject

6

1    defendant to: removal, also known as deportation, which may, under
2    some circumstances, be mandatory; denial of citizenship; and denial
3    of admission to the United States in the future.  The Court cannot,
4    and defendant's attorney also may not be able to, advise defendant
5    fully regarding the immigration consequences of the felony conviction
6    in this case.  Defendant understands that unexpected immigration
7    consequences will not serve as grounds to withdraw defendant's guilty
8    plea.

9                              FACTUAL BASIS

10       Defendant admits that defendant is, in fact, guilty of the
11   offense to which defendant is agreeing to plead guilty.  Defendant
12   and the United States agree to the statement of facts attached as
13   Exhibit B and agree that this statement of facts is sufficient to
14   support a plea of guilty to the charge described in this agreement
15   and to establish the Sentencing Guidelines factors set forth in
16   paragraph 11 below but is not meant to be a complete recitation of
17   all facts relevant to the underlying criminal conduct or all facts
18   known to either party that relate to that conduct.

19                           SENTENCING FACTORS

20       10.  Defendant understands that in determining defendant's
21   sentence the Court is required to calculate the applicable Sentencing
22   Guidelines range and to consider that range, possible departures
23   under the Sentencing Guidelines, and the other sentencing factors set
24   forth in 18 U.S.C. § 3553(a).  Defendant understands that the
25   Sentencing Guidelines are advisory only, that defendant cannot have
26   any expectation of receiving a sentence within the calculated
27   Sentencing Guidelines range, and that after considering the
28   Sentencing Guidelines and the other § 3553(a) factors, the Court will

                                   7

1  be free to exercise its discretion to impose any sentence it finds

2  appropriate up to the maximum set by statute for the crime of

3  conviction.

4      11.   Defendant and the United States agree that the following

5  Sentencing Guidelines factors apply:

6      Base Offense Level:              6          U.S.S.G. § 2B1.1(a)(2)

7      Specific Offense
       Characteristic: Value of
8      funds exceeds $9.5 million    +20          U.S.S.G. § 2B1.1(K)

9      Adjustment: Abuse of Position
       of Trust or Use of Special    +2          U.S.S.G. § 3B1.3
10     Skill

11
    The United States will agree to a two-level downward adjustment for
12
    acceptance of responsibility (and, if applicable, move for an
13
    additional one-level downward adjustment under U.S.S.G. § 3E1.1(b))
14
    only if the conditions set forth in paragraph 3 are met.  Defendant
15
    and the United States reserve the right to argue that additional
16
    specific offense characteristics, adjustments, and departures under
17
    the Sentencing Guidelines are appropriate.
18
       12.   Defendant understands that there is no agreement as to
19
    defendant's criminal history or criminal history category.
20
       13.   Defendant and the United States reserve the right to argue
21
    for a sentence outside the sentencing range established by the
22
    Sentencing Guidelines based on the factors set forth in 18 U.S.C.
23
    § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).
24
                    WAIVER OF CONSTITUTIONAL RIGHTS
25
       14.   Defendant understands that by pleading guilty, defendant
26
    gives up the following rights:
27
           a.   The right to persist in a plea of not guilty.
28

                                      8

1      b.    The right to a speedy and public trial by jury.

2      c.    The right to be represented by counsel -- and if

3   necessary, have the Court appoint counsel -- at trial.  Defendant

4   understands, however, that defendant retains the right to be

5   represented by counsel -- and if necessary, have the Court appoint

6   counsel -- at every other stage of the proceeding.

7      d.    The right to be presumed innocent and to have the

8   burden of proof placed on the government to prove defendant guilty

9   beyond a reasonable doubt.

10      e.    The right to confront and cross-examine witnesses

11   against defendant.

12      f.    The right to testify and to present evidence in

13   opposition to the charges, including the right to compel the

14   attendance of witnesses to testify.

15      g.    The right not to be compelled to testify, and, if

16   defendant chose not to testify or present evidence, to have that

17   choice not be used against defendant.

18      h.    Any and all rights to pursue any affirmative defenses,

19   Fourth Amendment or Fifth Amendment claims, and other pretrial

20   motions that have been filed or could be filed.

21                  WAIVER OF APPEAL OF CONVICTION

22   15.  Defendant understands that, with the exception of an appeal

23   based on a claim that defendant's guilty plea was involuntary, by

24   pleading guilty defendant is waiving and giving up any right to

25   appeal defendant's conviction on the offense to which defendant is

26   pleading guilty.  Defendant understands that this waiver includes,

27   but is not limited to, arguments that the statutes to which defendant

28   is pleading guilty are unconstitutional, and any and all claims that

9

1  the statement of facts provided herein is insufficient to support
2  defendant's plea of guilty.

3                 WAIVER OF APPEAL AND COLLATERAL ATTACK

4       16.   Defendant agrees that, provided the Court imposes a term of
5  imprisonment of no more than five years, defendant gives up the right
6  to appeal all of the following: (a) the procedures and calculations
7  used to determine and impose any portion of the sentence; (b) the
8  term of imprisonment imposed by the Court, including, to the extent
9  permitted by law, the constitutionality or legality of defendant's
10 sentence, provided it is within the statutory maximum; (c) the fine
11 imposed by the Court, provided it is within the statutory maximum;
12 (d) to the extent permitted by law, the constitutionality or legality
13 of defendant's sentence, provided it is within the statutory maximum;
14 (e) the term of probation or supervised release imposed by the Court,
15 provided it is within the statutory maximum; and (f) any of the
16 following conditions of probation or supervised release imposed by
17 the Court: the conditions set forth in Second Amended General Order
18 20-04 of this Court; the drug testing conditions mandated by 18
19 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use
20 conditions authorized by 18 U.S.C. § 3563(b)(7).

21      17.   Defendant also gives up any right to bring a post-
22 conviction collateral attack on the conviction or sentence, including
23 any order of restitution, except a post-conviction collateral attack
24 based on a claim of ineffective assistance of counsel, a claim of
25 newly discovered evidence, or an explicitly retroactive change in the
26 applicable Sentencing Guidelines, sentencing statutes, or statutes of
27 conviction.   Defendant understands that this waiver includes, but is
28 not limited to, arguments that the statutes to which defendant is

                                    10

1  pleading guilty are unconstitutional, and any and all claims that the
2  statement of facts provided herein is insufficient to support
3  defendant's plea of guilty.

4      18.   This agreement does not affect in any way the right of the
5  United States to appeal the sentence imposed by the Court.

6                    RESULT OF WITHDRAWAL OF GUILTY PLEA

7      19.   Defendant agrees that if, after entering a guilty plea
8  pursuant to this agreement, defendant seeks to withdraw and succeeds
9  in withdrawing defendant's guilty plea on any basis other than a
10  claim and finding that entry into this plea agreement was
11  involuntary, then the United States will be relieved of all of its
12  obligations under this agreement.

13                    EFFECTIVE DATE OF AGREEMENT

14      20.   This agreement is effective upon signature and execution of
15  all required certifications by defendant, defendant's counsel, and an
16  Assistant United States Attorney or Department of Justice Trial
17  Attorney.

18                    BREACH OF AGREEMENT

19      21.   Defendant agrees that if defendant, at any time after the
20  effective date of this agreement, knowingly violates or fails to
21  perform any of defendant's obligations under this agreement ("a
22  breach"), the United States may declare this agreement breached.  All
23  of defendant's obligations are material, a single breach of this
24  agreement is sufficient for the United States to declare a breach,
25  and defendant shall not be deemed to have cured a breach without the
26  express agreement of the United States in writing.  If the United
27  States declares this agreement breached, and the Court finds such a
28  breach to have occurred, then: (a) if defendant has previously

                                  11

1   entered a guilty plea pursuant to this agreement, defendant will not

2   be able to withdraw the guilty plea, and (b) the United States will

3   be relieved of all its obligations under this agreement.

4       22.   Following the Court's finding of a knowing breach of this

5   agreement by defendant, should the United States choose to pursue any

6   charge that was not filed as a result of this agreement, then:

7           a.   Defendant agrees that any applicable statute of

8   limitations is tolled between the date of defendant's signing of this

9   agreement and the filing commencing any such action.

10          b.   Defendant waives and gives up all defenses based on

11  the statute of limitations, any claim of pre-indictment delay, or any

12  speedy trial claim with respect to any such action, except to the

13  extent that such defenses existed as of the date of defendant's

14  signing this agreement.

15          c.   Defendant agrees that: (i) any statements made by

16  defendant, under oath, at the guilty plea hearing (if such a hearing

17  occurred prior to the breach); (ii) the agreed to factual basis

18  statement in this agreement; and (iii) any evidence derived from such

19  statements, shall be admissible against defendant in any such action

20  against defendant, and defendant waives and gives up any claim under

21  the United States Constitution, any statute, Rule 410 of the Federal

22  Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

23  Procedure, or any other federal rule, that the statements or any

24  evidence derived from the statements should be suppressed or are

25  inadmissible.

26  //

27  //

28  //

## COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

## OFFICE NOT PARTIES

23.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the United States' sentencing recommendations or the parties' agreements to facts or sentencing factors.

24.   Defendant understands that both defendant and the United States are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 11 are consistent with the facts of this case.  While this paragraph permits both the United States and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the United States' obligations not to contest the facts agreed to in this agreement.

25.   Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to

13

fulfill all defendant's obligations under this agreement.   Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

26.   Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the United States and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

14

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms.

1  be asserted either prior to or at trial, of the sentencing factors

2  set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

3  provisions, and of the consequences of entering into this agreement.

4  To my knowledge: no promises, inducements, or representations of any

5  kind have been made to my client other than those contained in this

6  agreement; no one has threatened or forced my client in any way to

7  enter into this agreement; my client's decision to enter into this

8  agreement is an informed and voluntary one; and the factual basis set

9  forth in this agreement is sufficient to support my client's entry of

10  a guilty plea pursuant to this agreement.

11

12

13  _____          6-20-2023
                                             _____
14  MICHAEL BROWN                            Date
    Attorney for Defendant
15  DAVID LEE KAGEL

16

17

18

19

20

21

22

23

24

25

26

27

28

17

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. |
|      Plaintiff, | I N F O R M A T I O N |
|      v. | [18 U.S.C. § 371: Conspiracy to Commit Commodity Fraud] |
| DAVID LEE KAGEL, | |
|      Defendant. | |

The United States Attorney charges:

[18 U.S.C. § 371]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

1.   Defendant DAVID LEE KAGEL was a resident of Beverly Hills, California.  Defendant KAGEL was an attorney admitted to practice in the State of California, and was the sole attorney at his law firm, Kagel Law P.C., located in Los Angeles, California.

2.   A "cryptocurrency" was a digital currency in which transactions were verified and records were maintained by a decentralized system using cryptography, rather than a centralized authority such as a bank or government.  Like traditional fiat

**Exhibit A**

1  currency (defined below), there were multiple types of

2  cryptocurrencies, such as Bitcoin.

3      3.   Cryptocurrency owners typically stored their cryptocurrency

4  in digital "wallets," which were identified by unique electronic

5  "addresses."

6      4.   A "fiat currency" was a government-issued currency that was

7  not backed by a physical commodity, such as gold or silver.  U.S.

8  Dollars, British Pounds, and Euros were examples of fiat currencies.

9      5.   Cryptocurrencies, like Bitcoin, could be traded for various

10  fiat currencies on numerous electronic cryptocurrency exchanges.

11      6.   Bitcoin was a "commodity" within the meaning of Title 7,

12  United States Code, Section 1a.

13  B.   THE OBJECT OF THE CONSPIRACY

14      7.   Beginning by no later than in or around December 2017 and

15  continuing until at least in or around June 2022, in Los Angeles

16  County, within the Central District of California, and elsewhere,

17  defendant KAGEL conspired with David Gilbert Saffron and with others

18  known and unknown to the United States Attorney, to knowingly and

19  willfully employ a manipulative and deceptive device, scheme, and

20  artifice to defraud in connection with a contract of sale of Bitcoin,

21  each such contract being a contract of sale of a commodity in

22  interstate commerce, in violation of Title 7, United States Code,

23  Sections 9(1) and 13(a)(5), and in violation of Title 17, Code of

24  Federal Regulations, Section 180.1(a).

25  C.   MANNER AND MEANS OF THE CONSPIRACY

26      8.   The object of the conspiracy was to be carried out, and was

27  carried out, in substance, as follows:

28

2

a.   From in or around December 2017 through at least in or around June 2022, defendant KAGEL with Saffron and their co-conspirators fraudulently promoted and solicited investments and obtained at least approximately $15,000,000 in victim-investor funds for various cryptocurrency trading programs.  Defendant KAGEL, Saffron, and their co-conspirators falsely represented to victim-investors that Saffron traded investors' funds and cryptocurrency to earn profits, including through purported cryptocurrency investment vehicles using names such as Circle Society, Bitcoin Wealth Management, the Omicron Trust, and Cloud9Capital, among other names.

b.   Defendant KAGEL, Saffron, and their co-conspirators were operating an illegal Ponzi scheme to defraud victim-investors and to take and use the funds for their own personal benefit.

c.   Defendant KAGEL and his co-conspirators made numerous false representations to victim-investors to induce them to invest cash or cryptocurrency in their cryptocurrency Ponzi scheme, including that:

i.   The investment programs used an artificial intelligence trading robot (an "AI trading bot") to buy and sell cryptocurrencies with victim-investors' funds that were "guaranteed" to repay the principal investment and profits of 20% - 100% of the principal investment amount within 30 days.

ii.  Victim-investors' principal investments were protected against loss for any reason and were guaranteed by a 1,000 Bitcoin wallet (approximately $11 million in January 2018) held in escrow by an attorney, namely, defendant KAGEL.

iii. Defendant KAGEL had himself invested in the cryptocurrency trading programs – a false representation that was

3

designed to lend credibility to claims that potential investors'
funds would be safely invested.

        d.   When victim-investors demanded the return of their
initial investment and promised profits, defendant KAGEL made various
false representations about the reasons that he could not repay
investors until some later time, including but not limited to the
false representation that defendant KAGEL was prevented from repaying
investors because Saffron had disabled defendant KAGEL's access to
the 1,000 Bitcoin wallet, which purportedly guaranteed victim-
investors' funds.

    9.   In furtherance of the conspiracy, defendant KAGEL, together
with other co-conspirators:

        a.   Made materially false statements to victim-investors
regarding the high-yield returns that would purportedly result from
investing in Saffron's cryptocurrency trading programs;

        b.   Made materially false statements to victim-investors
regarding the use of invested funds, falsely representing that funds
would be used to trade cryptocurrency and fiat currency to generate
profits for the victim-investors;

        c.   Failed to state material facts that made the
statements misleading to victim-investors regarding how victim-
investors' funds would be used, omitting that funds would be used to
personally enrich defendant KAGEL, as well as other co-conspirators;

        d.   By and through the co-conspirators' scheme to defraud
victim-investors in connection with contracts of sale of Bitcoin,
each being a contract of sale of a commodity in interstate commerce,
made untrue statements of a material fact, and failed to disclose

1  material facts that resulted in making their statements misleading;
2  and

3         e.    Made materially false statements to victim-investors
4  and to potential victim-investors to conceal the scheme and to induce
5  victims to re-invest in the scheme again.

6  D.    OVERT ACTS

7         10.  On or about the following dates, in furtherance of the
8  conspiracy and to accomplish its object, defendant KAGEL, together
9  with other conspirators, willfully committed and knowingly caused
10 others to commit the following overt acts, among others, within the
11 Central District of California, and elsewhere:

12     Overt Act No. 1:    On January 21, 2018, defendant KAGEL spoke
13 to potential victim-investors to fraudulently induce them to invest
14 and falsely represented that, as an attorney, defendant KAGEL held a
15 1,000 Bitcoin wallet in escrow that would guarantee the victim-
16 investors' money against loss for any reason.

17     Overt Act No. 2:    On January 21, 2018, defendant KAGEL sent
18 letters to victim-investors on letterhead from defendant KAGEL's law
19 firm falsely stating that defendant KAGEL had unrestricted access to
20 a 1,000 Bitcoin wallet that would be used to ensure repayment of the
21 victim-investors' initial investment.

22     Overt Act No. 3:    On July 28, 2020, defendant KAGEL spoke with
23 Victim S.B. to refer Victim S.B. to Saffron for the purpose of
24 inducing Victim S.B.'s investment into the Ponzi scheme.  Defendant
25 KAGEL falsely represented that Saffron was a successful
26 cryptocurrency trader, who made substantial returns for investors.
27 Defendant KAGEL knowingly and willfully omitted to tell Victim S.B.
28 that defendant KAGEL, together with Saffron and their co-

1 | conspirators, intended to take and use Victim S.B.'s funds for their
2 | own personal benefit, and the omission caused defendant KAGEL's
3 | statements to Victim S.B. to be materially misleading.

4 |   <u>Overt Act No. 4:</u> On September 30, 2020, to allay Victim
5 | S.B.'s concerns that Saffron had defrauded Victim S.B. of $375,000
6 | and to deter and delay Victim S.B. from acting on the concerns,
7 | defendant KAGEL falsely represented that defendant KAGEL had also
8 | invested with Saffron and defendant KAGEL trusted Saffron based on
9 | defendant KAGEL's long relationship with Saffron as his attorney.

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

JAMES C. HUGHES
Assistant United States Attorney
Major Frauds Section

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

THEODORE M. KNELLER
Trial Attorney, Fraud Section
Criminal Division
U.S. Department of Justice

**EXHIBIT B**

**STATEMENT OF FACTS**

Defendant acknowledges that if this case proceeded to trial, the United States would prove the following facts, among others, which defendant acknowledges to be true, beyond a reasonable doubt:

**I.   Background**

1.   From in or around December 2017 to at least in or around February 2021, DAVID LEE KAGEL was a resident of Los Angeles County, California, within the Central District of California.

2.   From in or around December 2017 to at least in or around March 2022, KAGEL was an attorney licensed to practice in the State of California.

3.   At all relevant times to this Statement of Facts, KAGEL had known David Gilbert Saffron personally for several years.

4.   Beginning in or around December 2017, and continuing until in or around June 2022, in Los Angeles County, within the Central District of California, and elsewhere, KAGEL knowingly and willfully participated in a scheme to defraud individuals in the United States by convincing them to invest in various cryptocurrency trading programs promoted by Saffron under the false pretense that Saffron would use an artificial intelligence trading robot ("AI trading bot") to trade investors' funds on global cryptocurrency exchanges.

5.   In furtherance of the scheme to defraud, KAGEL, Saffron, and other co-conspirators, knowingly and willfully:

a.   Made material untrue statements to potential investors, including that the AI trading bot could generate enormous profits and guaranteed that investors would be repaid 100% of the

1  principal investment plus 20% to 100% profits within 30 days of
2  investment.

3          b.   Failed to disclose material facts to potential
4  investors that made the statements misleading, including that KAGEL,
5  Saffron, and other co-conspirators were operating an illegal Ponzi
6  scheme to defraud victim-investors and to take and use the victim-
7  investors' funds for KAGEL's and Saffron's own personal use and
8  benefit.

9      6.   At all relevant times described in this Statement of Facts:

10         a.   "Cryptocurrency" was a digital currency in which
11  transactions were verified and records were maintained by a
12  decentralized system using cryptography, rather than a centralized
13  authority such as a bank or government.

14         b.   Many cryptocurrencies, including but not limited to
15  Bitcoin, were purchased and sold through the means of interstate
16  commerce on the relevant blockchain.

17         c.   Cryptocurrency owners typically stored their
18  cryptocurrency in digital "wallets," which were identified by unique
19  electronic "addresses."

20         d.   Cryptocurrencies, like Bitcoin, were traded for
21  various government-backed currencies, such as U.S. dollars, on
22  numerous electronic cryptocurrency exchanges in the United States and
23  around the globe.

24  **II.  Sham 1,000 Bitcoin Escrow Wallet That "Guaranteed" Investments**

25      7.   On or about January 7, 2018, KAGEL and Saffron agreed to
26  employ a manipulative and deceptive scheme to induce potential
27  investors to invest Bitcoin and other cryptocurrencies by offering to

28

"guarantee" the investments from loss with a sham 1,000 Bitcoin wallet.

8.    In and around January 2018, Saffron held numerous meetings with potential investors in the Central District of California and elsewhere.

9.    Saffron falsely represented that he would trade cryptocurrencies with investors funds using the AI trading bot that Saffron claimed to have developed.  Saffron guaranteed that he would double investors' money within 30 days.

10.   To create a false sense security and trust, Saffron falsely represented that he had given a cryptocurrency wallet containing 1,000 Bitcoin to Saffron's attorney, KAGEL, to hold in escrow as a guarantee against investors' loss for any reason.

11.   Following Saffron's meetings with potential investors, KAGEL knowingly and willfully made material untrue statements to the potential investors, including that KAGEL, acting as Saffron's attorney, held a cryptocurrency wallet containing 1,000 Bitcoin in escrow that guaranteed investors' funds with Saffron against loss.

12.   After speaking with numerous potential investors in or around January 2018, KAGEL sent at least 21 potential investors nearly identical letters on KAGEL's law firm letterhead (the "Guarantee Letters") between on or about January 7 and January 21, 2018, which stated, among other things:

        a.    KAGEL, and his law firm Kagel Law, were legal counsel to Saffron.

        b.    KAGEL understood that the investor would be depositing Bitcoin and other forms of cryptocurrency with Saffron, which Saffron would be investing on their behalf.

3

1          c.    Saffron agreed to return the investor's deposit with a
2   profit.

3      13.   KAGEL prepared and signed the Guarantee Letters.

4      14.   To induce the investors to invest Bitcoin or other
5   cryptocurrency in Saffron's fraudulent trading program, KAGEL
6   knowingly and willfully included the following untrue statements of
7   material facts in the Guarantee Letters:

8          a.    Saffron had given KAGEL unrestricted access to a
9   cryptocurrency wallet.

10         b.    Such cryptocurrency wallet contained 1,000 Bitcoin.

11         c.    KAGEL intended to use the 1,000 Bitcoin to repay
12  investor's deposit within 15 business days if Saffron was unable or
13  unwilling to pay the investor.

14  **III.   In furtherance of the conspiracy, KAGEL Concealed the Scheme**
15          **to Defraud**

16     15.   On or about January 21, 2018, KAGEL spoke to Victim H.C.,
17  and KAGEL knowingly and willfully made the untrue statement that he
18  held 1,000 Bitcoin in escrow for Saffron to guarantee Victim H.C.'s
19  deposit.

20     16.   On or about January 21, 2018, KAGEL sent Victim H.C. a
21  Guarantee Letter described above.

22     17.   On or about January 22, 2018, Victim H.C. invested $100,000
23  cash with Saffron to be invested and traded in Bitcoin and other
24  cryptocurrencies on Victim H.C.'s behalf.

25     18.   On or about January 23, 2018, law enforcement officers
26  arrested Saffron in Los Angeles, California for an outstanding arrest
27  warrant in Fulton County, Georgia on financial fraud-related charges.
28  Saffron remained in law enforcement custody until on or about

4

1  February 16, 2018.

2      19.  On or about January 29, 2018, KAGEL knowingly and willfully

3  falsely represented to Victim H.C. that Saffron was recovering from

4  an attack in the hospital.

5      20.  On or about February 5, 2018, an attorney representing

6  eight victims (the "Represented Victims") sent a letter to KAGEL

7  demanding that KAGEL use the 1,000 Bitcoin held in escrow to repay

8  206.5 Bitcoin (approximately $3.35 million) to the Represented

9  Victims according to the terms of one of KAGEL's Guarantee Letters.

10     21.  On or about February 5, 2018, negative comments accusing

11 Saffron of stealing Bitcoins appeared on consumer whistleblower

12 websites, including ripoffreport.com.

13     22.  On or about February 12, 2018, KAGEL falsely stated in a

14 letter to the attorney for the Represented Victims that Saffron had

15 disabled KAGEL's access to cryptocurrency wallet containing 1,000

16 Bitcoin, and therefore, KAGEL was unable to pay the Represented

17 Victims.  This statement was false because Saffron had never provided

18 KAGEL access to 1,000 Bitcoin.

19     23.  On or about February 23, 2018, KAGEL sent to Victim G.H.

20 another Guarantee Letter, which was nearly identical to the prior

21 Guarantee Letters except that it (a) referred to Saffron as "David

22 Gilbert" instead of "David Saffron" to conceal Saffron's true

23 identity and hide public allegations against Saffron of Bitcoin fraud

24 and theft, and (b) falsely stated that KAGEL held a cryptocurrency

25 wallet with 1,500 Bitcoin to guarantee Victim G.H.'s investment.

26 //

27 //

28 //

**IV.** **Saffron Transfers Bitcoin Valued at more than $250,000 to KAGEL in 2018**

24.   Between on or about April 11, 2018 and December 5, 2018, Saffron made 15 Bitcoin transfers to multiple intermediaries of Bitcoin valued at more than $250,000, which KAGEL knew were derived from Saffron and KAGEL's scheme to defraud investors.

25.   The intermediaries, at Saffron's and KAGEL's direction, transferred the corresponding amount of funds in U.S. dollars to KAGEL's bank account ending in x6073, including but not limited to the following three transfers:

| Approximate Date | Saffron Bitcoin (BTC) Transfer to Intermediary | Intermediary Bank Wire Amount to Kagel | Description of Wire |
|---|---|---|---|
| July 20, 2018 | 3.9995 BTC | $   25,000 | Bank A Wire from Bitcoin Intermediary 1 in Texas to KAGEL's bank account x6073 at Bank B in Los Angeles, California |
| August 8, 2018 | 3.47798 BTC | $   20,000 | Bank A Wire from Bitcoin Intermediary 1 in Texas to KAGEL's bank account x6073 at Bank B in Los Angeles, California |
| August 31, 2018 | 4.00232 BTC | $   25,000 | Bank A Wire from Bitcoin Intermediary 1 in Texas to KAGEL's bank account x6073 at Bank B in Los Angeles, California |

**V.** **KAGEL Transferred Nearly $200,000 to Saffron in 2020 in a Manner Designed to Conceal Saffron's Assets**

26.   On or about February 28, 2019, the U.S. Commodity Futures Trading Commission ("CFTC"), took KAGEL's testimony in connection

6

1  with the CFTC's investigation of Saffron and KAGEL's illegal Ponzi
2  scheme.

3      27.   The CFTC was and is a United States government civil
4  regulatory agency that is responsible for enforcing prohibitions on
5  fraud in U.S. commodity derivates markets.

6      28.   On or about July 24, 2019, KAGEL and Saffron's co-
7  conspirator, Co-Conspirator 1 ("CC-1"), agreed to and did add Saffron
8  as a signatory to CC-1's corporate bank account ending in x2409.

9      29.   On or about September 30, 2019, the CFTC filed a complaint
10 in the U.S. District Court of Nevada alleging that Saffron defrauded
11 investors in connection with cryptocurrency investments.   CFTC v.
12 David Gilbert Saffron, et al., 2:19-cv-01697 (D. Nev.) (ECF 1).

13     30.   On or about December 6, 2019, the U.S. District Court of
14 Nevada ordered that all of Saffron's assets be frozen and subject to
15 a "full and truthful accounting." (Id. at ECF 31).

16     31.   From on or about May 27, 2020 to on or about July 28, 2020,
17 KAGEL made six bank wire transfers totaling $120,000 to bank account
18 ending in x2409 in which CC-1 and Saffron were signatories.

19     32.   KAGEL knew that the $120,000 were the proceeds of fraud.

20     33.   KAGEL knew that the transfers of the $120,000 to the
21 corporate bank account ending in x2409, to which Saffron was a
22 signatory, were designed, in whole or in part, to conceal or disguise
23 the location, source, ownership, and control of the proceeds.
24 //
25 //
26 //
27 //
28 //

7

34.   KAGEL made the following bank wire transfers:

| Approximate Date | Intermediary Bank Wire Amount From Kagel | Description of Wire |
|---|---|---|
| May 27, 2020 | $ 30,000 | Wire from KAGEL's bank account x6073 to CC-1's bank account x2409 |
| July 22, 2020 | $ 15,000 | Wire from KAGEL's bank account x6073 to CC-1's bank account x2409 |
| July 23, 2020 | $ 15,000 | Wire from KAGEL's bank account x6073 to CC-1's bank account x2409 |
| July 24, 2020 | $ 10,000 | Wire from KAGEL's bank account x6073 to CC-1's bank account x2409 |
| July 27, 2020 | $ 20,000 | Wire from KAGEL's bank account x6073 to CC-1's bank account x2409 |
| July 28, 2020 | $ 30,000 | Wire from KAGEL's bank account x6073 to CC-1's bank account x2409 |

35.   Between on or about June 15, 2020 to August 4, 2020, KAGEL sent 25 bank-to-bank transfers for $5,000 or less via a money transfer App totaling $78,250.

36.   KAGEL knew that the $78,250 were the proceeds of fraud.

37.   Each transfer from KAGEL's bank account ending in x6073 to Saffron's personal bank account ending in x3959.  KAGEL and Saffron agreed to send several transfers of $5,000 or less via the money transfer App to conceal the location, source, ownership, and control of the proceeds.

V.   **KAGEL Defrauded Victim S.B.**

38.   On or about July 28, 2020, to induce Victim S.B. to invest with Saffron, KAGEL falsely stated to Victim S.B. that Saffron was a genius cryptocurrency trader, who made substantial returns for investors.

1    39.   KAGEL knowingly and willfully failed to tell Victim S.B.

2  material facts that resulted in making KAGEL's statements to

3  Victim S.B. misleading, including that:

4         a.   A court entered a judgment against KAGEL and Saffron

5  in a lawsuit for defrauding Bitcoin investors in 2018.

6         b.   The CFTC had sued Saffron in 2019 for fraud in

7  connection with Bitcoin and other cryptocurrencies.

8         c.   KAGEL and Saffron intended to use Victim S.B.'s

9  investment for their own personal use and benefit.

10   40.   KAGEL knowingly and willfully made material untrue

11  statements to Victim S.B. to induce Victim S.B.'s investment in

12  Saffron's sham cryptocurrency trading program, including that:

13         a.   KAGEL believed that Victim S.B. could trust Saffron

14  because KAGEL had personally known Saffron for a long time and had

15  worked as Saffron's attorney.

16         b.   Saffron was trustworthy and so successful at

17  cryptocurrency trading that KAGEL had invested a substantial amount

18  of his own money with Saffron.

19   41.   On or about September 16, 2020, in reliance on KAGEL's and

20  Saffron's knowing and willful statements of untrue material facts and

21  failures to disclose material facts that made their statements

22  misleading, Victim S.B. invested the approximate equivalent of

23  $375,000 in Bitcoin and other cryptocurrency with Saffron through an

24  investment firm called Cloud9Capital.

25   42.   In reliance on KAGEL and Saffron's material untrue

26  statements, Victim S.B. believed that Saffron would trade

27  Victim S.B.'s cryptocurrency investment at Cloud9Capital, and Victim

28  S.B. would have his investment repaid with a 20% profit in 30 days.

9

1     43.    In truth, Cloud9Capital was a sham cryptocurrency trading

2    program that SAFFRON falsely represented was operated by a third

3    party, and, in fact, Saffron controlled the cryptocurrency wallet

4    that received Victim S.B.'s investment.

5     44.    On or about September 30, 2020, Victim S.B. contacted KAGEL

6    because Victim S.B. had become concerned that Saffron was not honest

7    and trustworthy and did not intend to repay Victim S.B. as promised.

8     45.    In an attempt to delay or deter Victim S.B. from acting,

9    KAGEL falsely stated, knowingly and willfully, that Saffron was

10   trustworthy and could be depended upon to repay Victim S.B. timely

11   and in full.

12    46.    But in truth and in fact, KAGEL and Saffron kept

13   Victim S.B.'s investment for their own personal use and benefit and

14   had never intended to repay Victim S.B.

15    47.    During the period of KAGEL's participation in the

16   conspiracy, KAGEL and his co-conspirators defrauded victims of more

17   than $9,500,000.

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, **T. Montes**, declare:

That I am a citizen of the United States and a resident of or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

**PLEA AGREEMENT FOR DEFENDANT DAVID LEE KAGEL**

☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:

☐ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows:

☐ By hand delivery, addressed as follows:

☒ By email, as follows:
c/o David Lee Kagel
Michael L. Brown, DFPD
Office of the Federal Public Defender
321 E 2nd Street
Los Angeles, CA 90012
Email:  Michael_L_Brown@fd.org

☐ By messenger, as follows:

☐ By Federal Express, as follows:

This Certificate is executed on June 27, 2022, at Los Angeles, California.  I certify under penalty of perjury that the foregoing is true and correct.

/s/
**T. Montes**
Legal Assistant