RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
BENJAMIN F. J. NEMEC
Assistant Federal Public Defender
Nevada State Bar No. 14591
Las Vegas, NV 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
Ben_Nemec@fd.org

Attorney for David Kagel

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| United States of America, | Case No. 2:24-cr-00024-GMN-DJA |
| Plaintiff, | **Sentencing Memorandum**[1] |
| v. | |
| David Kagel, | |
| Defendant. | |

The universe has already imposed whatever sentence this Court could fashion against Mr. Kagel. Mr. Kagel, 86 years old, is bedridden. He sleeps most of the day with his mental faculties stripped from him. There is no reason to depart from what Probation, and the government, recommend: five years' probation.

---

[1] This memorandum is untimely. However, the government graciously agreed not to object to Mr. Kagel's untimely filing due to defense counsel's trial in Washington, D.C. that went longer than expected.

## I. Background

Mr. Kagel was sick. Specifically, he had dementia.[2] Dementia is an insidious disease that creeps up on someone, slowly draining cognitive resources in a way that's invisible to friends and loved ones who surround the victim. This is especially true when someone has relatively high language skills, like Mr. Kagel,[3] because sufferers like Mr. Kagel can hide decline through sharp conversation.

The first person to notice Mr. Kagel's decline was his long-time wife of 58 years.[4] As early as 2018, Mr. Kagel had "become increasingly forgetful and was struggling to take care of himself."[5] This was especially problematic because Mr. Kagel had been diagnosed with prostate cancer while his wife was terminally ill.[6]

This vulnerable state made Mr. Kagel the perfect accomplice to Mr. Saffron, who is a defendant in a separate California case dealing with the same underlying conduct. Mr. Saffron had victimized Mr. Kagel in the past, but for whatever reason, Mr. Saffron was in Mr. Kagel's blind spot. For example, in 2012 or 2013, Mr. "Saffron had allegedly copied all of his parent's credit cards and ran up $30,000 in debt on them."[7] Later, Mr. Kagel's deceased wife believed Mr. Saffron stole from the family without Mr. Kagel's awareness.[8]

---

[2] Exhibit A, David Kagel Dementia Evaluation.
[3] Ex. A, p. 2.
[4] Ex. A, p. 6.
[5] Ex. A, p. 6.
[6] Ex. A, p. 6.
[7] Ex. A, p. 8.
[8] Ex. A, p. 6.

While Mr. Saffron was always a problem for Mr. Kagel, with Mr. Kagel's cognitive decline, Mr. Saffron was able to take even more advantage of Mr. Kagel. Mr. Kagel scores abysmally on cognitive tests. He is in the fifth percentile for immediate memory.[9] The first percentile in the visuospatial/constructional understanding.[10] His delayed memory is only in the 0.1 percentile.[11] And his attention barely even registers.[12]

While Mr. Kagel's decline may not have been as severe when the conspiracy started, it was starting. His dementia robbed Mr. Kagel of the ability to think through his actions, causing him to "struggle with careful reasoning, problem solving, and thinking through the consequences of those actions," as well as "poor insight into the extent and severity of these difficulties."[13]

So, in his cognitively reduced state, Mr. Kagel was recruited by Mr. Saffron (along with other conspirators) in a Ponzi scheme. Mr. Kagel's role mostly consisted of sending a letter advising of a nonexistent 1,000 Bitcoin wallet and covering for Mr. Saffron when victims started asking questions. Notably, Mr. Kagel did not actually profit from the scheme—indeed, "in 2018 or 2019, Eric [Mr. Kagel's son] recalled his mother telling him that his father had not been bringing in any income, and this was reportedly unusual for him."[14]

Perhaps if Mr. Kagel had his full mental capacity, he wouldn't have made these decisions. But he did. As a result, Mr. Kagel was charged with conspiracy

---

[9] Ex. A, p. 2.
[10] Ex. A, p. 2.
[11] Ex. A, p. 2.
[12] Ex. A, p. 2.
[13] Ex. A, p. 8.
[14] Ex. A, p. 7.

to commit commodity fraud. *United States v. Kagel*, 2:22-cr-00276-DSF, ECF No. 1 (C.D. Cal. June 28, 2023). This case was transferred to this jurisdiction to dispose of the guilty plea pursuant to Fed. R. Crim. Pro. 20. ECF No. 1.

On May 13, 2024, this Court held a change of plea hearing.[15] This change of plea never went forward.[16] On his way to the hearing, Mr. Kagel fell in the elevator and received medical treatment. Undersigned counsel, who was in the elevator, unfortunately can confirm there was incontinence during the fall. Mr. Kagel was transported back to hospice care, and the matter was continued.

Two weeks later, on May 28, 2024, this Court held the continued change of plea hearing. Mr. Kagel arrived, this time in a wheelchair. As this Court may recall, this hearing was mired with difficulties due to Mr. Kagel's severe hearing impairment. Indeed, Dr. Jones-Forrester noted Mr. Kagel "required significant volume to understand communications during testing."[17] His family, and prior conversations between undersigned counsel and Mr. Kagel, confirms this, where a declarant must be yelling in Mr. Kagel's ear for Mr. Kagel to hear them. Nevertheless, this Court found a solution, and Mr. Kagel pled guilty.[18]

But in between the conspiracy and now, Mr. Kagel's day-to-day life has been a nightmare due to his dementia. He sleeps "much of the day" and "has nightmares every few days."[19] For the few hours he is awake, Mr. Kagel needs to

---

[15] ECF No. 16.
[16] ECF No. 16.
[17] Ex. A, p. 1.
[18] ECF No. 24.
[19] Ex. A, p. 4.

4

be reminded to eat and drink.[20] Mr. Kagel isn't even aware of how far down he has slid, as he is convinced he has no attention or memory problems.[21]

## II. The sentencing factors warrant five-years' probation.

This Court must consider the factors promulgated by 18 U.S.C. § 3553(a) in addition to the advisory Guidelines range. *United States v. Booker*, 543 U.S. 220, 245, 259-60 (2005). As relevant here, section 3553(a) requires courts to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (4) the kinds of sentence and the sentencing range established for [the offense];
> (7) the need to provide restitution to any victims of the offense.

These factors support five years' probation.

### A. The nature and characteristics of the offense weighed against Mr. Kagel's characteristics does not warrant a custodial sentence.

Certainly, the scheme was wide ranging and financially injured a great number of people. But Mr. Kagel's role in the conspiracy was not one of the main drivers. Instead, his role was simply one of assurance. Mr. Saffron was clearly

---

[20] Ex. A, p. 4.
[21] Ex. A, p. 4.

5

the ringleader—without him, the conspiracy would not have happened. But if Mr. Kagel was not in the conspiracy, the scheme would have still gone forward, albeit without the extra assurance Mr. Kagel provided. Simply put, while Mr. Kagel *helped* with the conspiracy, he was not *essential* to it.

And when putting the nature of the offense in context with Mr. Kagel's dementia, it shines light on the fact that Mr. Kagel's culpability is greatly diminished. In 2017, Mr. Kagel was already showing signs of dementia, and by the end of 2017, when the conspiracy started, his mental faculties were diminished. There is no doubt Mr. Kagel should've known better—but the early stages of dementia stripped him of the defenses necessary to avoid getting involved in the conspiracy. And as the dementia worsened, so too did Mr. Kagel's decision making capabilities.

And, bleak as it is, Mr. Kagel would not appreciate prison even if this Court gives him a custodial sentence. He may find out he's in prison anew every day. Mr. Kagel lacks the awareness necessary to feel the effects of prison that other inmates do. Prison would be ineffective.

> **B.     Five years' probation achieves the goals of sentencing.**
>
> **1.     Five years' probation will reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.**

Five years' probation does not let Mr. Kagel off easy. Mr. Kagel will continue to be bedridden, sleeping most of the day away, unaware as he slowly deteriorates. Each day that passes is another day Mr. Kagel loses a part of who he is. The once bright lawyer has been reduced to an often-incomprehensible mess, unable to control his physical and mental faculties. Probation for Mr.

6

Kagel does not equal freedom: it merely continues his dementia prison as he deteriorates.

### 2. Five years' probation affords deterrence to criminal conduct.

Mr. Kagel has already lost everything. He needs help with all daily activities. He has been stripped of his law license and, even if he still could legally practice, would not be able to physically practice law given his dementia. He is penniless, relying on his daughter and son to pay for his constant hospice care. Any deterrence has already happened.

### 3. Mr. Kagel is no threat to the public.

Prison will not protect the public. Mr. Kagel cannot commit any crimes excessively sleeping most of the day and bedridden. The public has nothing to fear from someone who needs aid with basic hygiene. Prison does not help protect the public.

### 4. Prison will not provide the necessary medical care.

Mr. Kagel has a laundry list of medical issues: "weakness, frailty, incontinence of bowel and bladder, hard of hearing, unsteady gait, acute kidney injury, GERD, depression, sleep apnea, chronic neck pain, and malignant neoplasm prostate" along with "visual hallucination" and "his current dementia diagnosis."[22] While the Bureau of Prisons provides as much medical care as possible, it cannot bear the burden of the "24/7 caregiving for all activities of structure living" that hospice care does.[23]

---

[22] Ex. A, p. 9.
[23] Ex. A, p. 8.

With Mr. Kagel's issues, prison for any length of time may indeed be deadly. Mr. Kagel does not have the ability to advocate for himself nor the survival skills necessary to stay safe in prison, nor does he have the decision-making skills to navigate the bureaucratic maze the Bureau of Prisons presents when it comes to medical care. He should be given probation to allow his continued end-of-life care.

### C. The guidelines do not capture the proper sentence for Mr. Kagel.

The PSR's guideline calculations recommend a sentence of 108 to 135 months.[24] The fact that the guidelines far outstrip the five-year statutory maximum. Kagel's conviction demands when this is Mr. Kagel's first conviction already indicates the guidelines are far off. And the reason is that Mr. Kagel's guidelines are propelled because of the loss amount, which is a poor measuring stick for culpability.

"Congress established the [Sentencing] Commission to formulate and constantly refine national sentencing standards. *Kimbrough v. United States*, 552 U.S. 85, 108 (2007). "Carrying out its charge, the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id.* at 110 (internal citation and quotation marks omitted). When the Commission fails to fulfil its characteristic institutional role, the resulting guideline is entitled to less deference and the sentencing court may vary from it "based on [a] policy disagreement …, and not simply based on an individualized determination that [it] yield[s] an excessive sentence in a

---

[24] PSR ¶ 141.

8

particular case.  *Spears v. United States*, 555 U.S. 261, 266 (2009).  A guideline's lack of empirical support is not an uncommon problem,[25] and it is one from which § 2B1.1 also suffers.

In 1987, The Sentencing Commission promulgated the initial Sentencing Guidelines.  To do so, it analyzed more than 10,000 presentence investigation reports and data from nearly 100,000 federal convictions during a two-year period.[26]  From this data, the Commission ascertained "the average sentences imposed in [various] categories of cases prior to the creation of the Commission" and independently develop[ed] sentencing range[s] … consistent with the purposes of sentencing described in 3553(a)(2) of title 18."[27]

While the guideline penalties for most offenses are at least *allegedly* based on the pre-guideline empirical data developed by the initial Sentencing

---

[25] *See e.g.*, *Kimbrough*, 552 U.S. at 110 (2007) (concluding that drug guideline's former 100 to 1 crack/cocaine ratio lacked empirical support); *United States v. Henderson*, 649 F.3d 955, 963 (2017) (concluding that the child pornography guideline is, "to a large extent, not the result of the Commission's exercise of its characteristic institutional role. . . but of frequent mandatory minimum legislation and specific congressional directives," supporting policy based variance); *United States v. Nawanna*, 321 F.Supp.3d 943, 951 (N.D. Iowa 2018), *United States v. Ibarra-Sandoval*, 265 F.Supp.3d 1249, 1255 (D.N.M. 2017) (both varying from methamphetamine guideline because Commission's purity rationale lacks empirical support); *United States v. Cabrera*, 567 F.Supp.2d 271 (D. Mass. 2008) (varying downward based on drug guideline's "overemphasis on quantity and the under-emphasis on role in the offense" and reducing guideline range by one-third).

[26] *See* U.S. Sentencing Comm'n, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 16 (1987), *available at* https://www.ussc.gov/guidelines/guidelines-archive/1987-supplementary-reportinitial-sentencing-guidelines-and-policy-statements (last accessed November 23, 2022).

[27] 28 USC 994(m).

9

Commission,[28] the economic crime guidelines were not.[29] Instead, the Sentencing Commission designed the initial fraud guideline to alter the pre-guidelines status quo of probation.[30] The goal was to ensure that white collar offenders faced "***short*** but definite period[s] of confinement."[31] While the "upward rachet" of the Guidelines for economic crimes began with the initial set of Guidelines and some of the initial upward adjustment may have been warranted, the fraud guideline has continued to produce exponentially increasing guideline ranges completely untethered to the original goal of producing short but certain confinement and is devoid of empirical support.[32]

Since their inception, "the Sentencing Commission tweaked the theft and fraud guidelines nearly annually."[33] Even after the guidelines for theft and fraud

---

[28] Mark W. Bennett, Justin D. Levinson, Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 951 n.48 (March 2017) (explaining that although the Sentencing Commission did farm data from 100,000 cases, "it immediately, and arbitrarily without explanation then or now, jettisoned the nearly 50% of federal sentences where a defendant was given probation"); *See also United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012) ("[T]he Sentencing Guidelines were originally designed to moderate unwarranted disparities in federal sentencing by enacting a set of complicated rules that, it as hypothesized, would cause federal judges to impose for any given crime a sentence approximately equal to what empirical data showed was the average sentence previously imposed by federal judges for that crime . . . . From almost the outset, however, the Guidelines deviated from this goal").

[29] *Id.*

[30] *Id.* at 950–51.

[31] U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: *An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, 56 (Nov. 2004). There is support for the proposition that certainty of punishment has a greater general deterrent effect than severity of punishment.

[32] Bennett, et al., supra note 56 at 952–53.

[33] Bennett, et al., supra note 56 at 973 (citing Frank O. Bowman, III, *Pour Encourager les Autres? The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines Amendments That Followed*, 1 Ohio St. J. Crim. L. 373, 387 (2004) (cleaned up)).

were consolidated in 2001 as part of the economic crime package, they continued to be "the subject of sustained comment and critique."[34]  Federal judges referred to the fraud guidelines as "a black stain on common sense," *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008), "patently unreasonable" and "so run amok that they are patently absurd on their face," *United States v. Adelson*, 441 F. Supp. 2d 506, 506, 515 (S.D.N.Y. 2006), "of no help;" *United States v. Watt*, 707 F.Supp.2d 149, 151 (D. Mass. 2010), and both "fundamentally flawed" and "valueless." *United States v. Corsey*, 723 F.3d 366, 377, 380 (2d Cir. 2013) (Underhill, J., concurring), Judge Rakoff of the Southern District of New York explained that "the number assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice." *United States v. Gupta*, 904 F.Supp.2d 349, 351 (S.D.N.Y. 2012).  Judge Rakoff went on to explain that the fraud guidelines were "no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect[ed] an ever more draconian approach to white-collar crime, unsupported by empirical data." *Id.*  Other commentators, however, have observed that this is too kind an assessment because the Guidelines, and in particular the fraud guideline, were never tied to the mean.[35]

Despite that most stakeholders viewed the fraud guideline as fundamentally broken and in need of substantial revisions—particularly its

---

[34] Bennett, et al., supra note 56 at 973 (citing Frank O. Bowman, III, *Damp Squib: The Disappointing Denouement of the Sentencing Commission's Economic Crime Project (and What They Should Do Now)*, 27 FED. SENT'G REP. 270, 270 (2015); see also Douglas A. Berman, Fiddling with the Fraud Guidelines as Booker Burns, 27 FED. SENT'G REP. 267, 267 (2015) ("The federal fraud guidelines have long had many critics among judges and commentators").

[35] Bennett, et al., supra note 56 at 974.

11

overwhelming emphasis on loss—the Sentencing Commission ultimately promulgated only modest revisions effective in November of 2015.[36] The American Bar Association and leading commentators agree that these amendments did not go far enough and that significant changes are needed to restore the faith of judges, scholars, and commentators alike.[37] "[A]s with a wide range of critics, federal judges lack sufficient confidence in the policies underlying the [fraud] guideline and the ranges it produces," resulting in frequent below-guideline sentences.[38] This is reflected by the sentencing statistics, which show that only 40% of defendants sentenced under § 2B1.1 receive a guideline-range sentence.

The central critiques of the fraud guideline remain "the oversized role" of loss amount and the proliferation of specific offense characteristics (SOCs), neither of which have ever been adequately explained and both of which combine to produce increasingly massive guideline ranges.[39] Indeed, "the Commission has never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic."[40] "Most SOCs unnecessarily complicate guideline computation with little corresponding benefit and have little or no empirical basis either for the SOC or

---

[36] Bennett, et al., supra note 56 at 976–78; Miriam H. Baer, *Sorting Out White-Collar* Crime, 97 TXLR 225, 251 ("The end result was a modestly revised guideline in which the Commission softened several of § 2B1.1's harsher provisions, but otherwise left the Guideline's emphasis on loss amount intact").
[37] *Id.* at 980.
[38] *Id.* at 989.
[39] *Id.* at 981–88. *See United States v. Kirilyuk*, 29 F. 4th 1128, 1137 (9th Cir. 2022) (recognizing that the offense level under current § 2B1.1 is determined in larger part by the crime's loss amount).
[40] Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in Federal Courts* at 69–70 (1998).

12

the value assigned to it."[41]  Making matters worse, "the extensive proliferation and 'piling on' of SOCs" can quickly increase the guideline range higher than the sentence for second-degree murder and leads to "factor creep," i.e., where factors overlap and combine to overstate culpability.[42]  This case illustrates these problems.

The below table illustrates the effect of loss amount on Mr. Kagel's guideline range, exclusive of other specific offense characteristics. That range has increased from a low end of 24 months in 1987 to a low end of 57 months under the current guideline—a more than 50% increase due to loss amount alone:

| Year/Guideline | Base Offense Level | Increase for Loss Amount of more than $9M but less than $25M | Guidelines Range (based on CH I) |
|---|---|---|---|
| 1987–1988/2F1.1[43] | 6 | 11 (more than $5M) | 24–30 |
| 1989/2F1.1[44] | 6 | 15 (more than $10M but not more than $20M) | 37–46 |

---

[41] Bennett, et al., supra n. 56 at 986.
[42] *Id.* (citation omitted).
[43] https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1988/manual-pdf-06/Chapter_2_E-K.pdf (last accessed October 1, 2024).
[44] https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1989/manual-pdf/Chapter_2_E-K.pdf (last accessed October 1, 2024).

13

| | | | |
|---|---|---|---|
| 1990–2000/2F1.1[45] | 6 | 15 (more than $10M but not more than $20M) | 37–46 |
| 2001–2002/2B1.1[46] | 6 | 20 (more than $7M but not more than $20M) | 63-78 |
| 2003–2014/2B1.1[47] | 7 | 20 (more than $7M but not more than $20M) | 70-87 |
| 2015–2022/2B1.1[48] | 7 | 20 (more than $9.5M but not more than $20M) | 70-87 |

This Court has the power to consider whether the range recommended by the guidelines is grounded with empirical support when fashioning an appropriate sentence. As Judge Rakoff and scholars have asked, in 1987 a defendant in Mr. Kagel's shoes would face a guideline range of 30 to 37 months.[49] Today, he faces a sentence of 108 to 135 months—over *triple* the low end of the

---

[45] https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1990/manual-pdf/Chapter_2_E-K.pdf (last accessed October 1, 2024).
[46] https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2001/manual/CHAP2_1.pdf (last accessed October 1, 2024).
[47] https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2003/manual/CHAP2-1.pdf (last accessed October 1, 2024).
[48] https://www.ussc.gov/guidelines/2015-guidelines-manual/2015-chapter-2-c#NaN (last accessed October 1, 2024).
[49] Mr. Kagel's guidelines would've been enhanced by two levels under § 2F1.1(b)(2) under the 1987 guidelines because it was a scheme to defraud more than one victim.

14

guideline range in 1987, only to be saved by the statutory maximum, which is still nearly double the guideline range under 1987. Is such a crime really so much worse than it was in 1987? "Had any of the factors that underlie rational sentencing so radically changed as to warrant such a huge increase?"[50] The answer is no, and particularly not in view of the facts underlying the offense where Mr. Kagel did not personally profit from the scheme.

### 1. Actual and intended loss are poor proxies for offense seriousness and culpability.

The most important driver of sentences for economic crimes under the guidelines is the amount of pecuniary harm that the defendant either *actually* caused or *intended* to cause.[51] The Commission has explained that actual and intended loss function as rule-based proxies for the seriousness of the offense and the culpability of the offender, respectively.[52] In the Commissioner's view, "[s]o long as higher actual losses are associated with greater harm and higher intended losses with greater culpability, the loss-based proxies will further the Commission's goal of uniform and predictable sentences" while also "grading defendants proportionally by the harm they imposed and their culpability."[53]

But actual loss and intended loss are not good proxies for offense seriousness or culpability. By measuring harm and culpability with respect to actual and intended loss, the rules in the fraud guidelines are based on

---

[50] *Gupta*, 904 F.Supp. at 350.

[51] § 2B1.1(b)(1).

[52] § 2B1.1 cmt. Background; U.S. SENTENCING GUIDELINES MANUAL app. C, vol. II (U.S. SENTENCING COMM'N 2015).

[53] U.S. SENTENCING GUIDELINES MANUAL ch. 1, pt. A ("[T]he Commission developed these guidelines as a practical effort toward the achievement of a more honest, uniform, equitable, proportional, and therefore effective sentencing system.").

15

generalizations that necessarily fail to capture the full range of facts that might be relevant to evaluating harm and culpability in a given case.[54]  Unfortunately, the Commission "has nowhere stated, much less explained, why these quantifiable differences in harm caused are *appropriate* measurements of the extent of individual culpability, or why they are more significant than other sentencing factors that receive less weight in guidelines sentencing calculations."[55]

      The guidelines miss the mark.  They are not based in logic, facts, or data.  This Court should decline to consider them.  Instead, this Court should sentence Mr. Kagel to five years' probation as requested by the government and Probation.

RENE L. VALLADARES
Federal Public Defender

By:                         */s/Benjamin F. J. Nemec*
BENJAMIN F. J. NEMEC
Assistant Federal Public Defender
Attorney for David Kagel

---

[54] Daniel S. Guarnera, *A Fatally Flawed Proxy: The Role of Intended Loss in the U.S. Sentencing Guidelines for Fraud*, 81 Mo. L. Rev. 715, 739 (2016).

[55] Kate Stith & Jose A. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 69 (1998).

16